## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LISA ANN AURILIO,

     Plaintiff,

     v.

NANCY A. BERRYHILL, Acting Commissioner of
Social Security,

     Defendant.

No. 3:18-cv-00587 (MPS)

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

In this appeal from the Social Security Commission's denial of benefits, plaintiff Lisa Ann Aurilio argues that the Administrative Law Judge (ALJ) (1) violated the treating source rule; (2) failed to adequately develop the record; (3) made unsupported Step Five findings; (4) improperly failed to analyze her Lyme Disease; and (5) failed to properly analyze her testimony regarding her pain. I agree with Ms. Aurilio's first and second argument and grant her motion to remand the case to the Commissioner.

I assume familiarity with Ms. Aurilio's medical history (summarized in a stipulation of facts filed by the parties (ECF No. 18-1), which I adopt and incorporate herein by reference), the ALJ's opinion, the record, and the five sequential steps used in the analysis of disability claims. I cite only those portions of the record and the legal standards necessary to explain this ruling.

## I. Standard of Review

"A district court reviewing a final . . . decision pursuant to . . . 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Accordingly, a district court may not make a

de novo determination of whether a plaintiff is disabled in reviewing a denial of disability benefits.  *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the court's function is to ascertain whether the correct legal principles were applied in reaching the decision, and whether the decision is supported by substantial evidence.  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  If the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position.  *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982). The Second Circuit has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citation and quotation marks omitted).  Substantial evidence must be "more than a mere scintilla or a touch of proof here and there in the record."  *Id.*

## II.  Discussion

### A.  The Treating Physician Rule

Ms. Aurilio argues that the ALJ failed to comply with the treating physician rule when he ascribed "little weight" to the opinions of Dr. DeFusco and Dr. Dempsey.  (ECF No. 18-2 at 2.) I agree.

Under the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citation and quotation marks omitted).  "The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given

to the opinion." *Schrack v. Astrue*, 608 F. Supp. 2d 297, 301 (D. Conn. 2009). The Second

Circuit has made clear that:

> To override the opinion of the treating physician ... the ALJ must
> explicitly consider, inter alia: (1) the frequency, length, nature, and extent
> of treatment; (2) the amount of medical evidence supporting the opinion;
> (3) the consistency of the opinion with the remaining medical evidence;
> and, (4) whether the physician is a specialist. After considering the above
> factors, the ALJ must comprehensively set forth his reasons for the weight
> assigned to a treating physician's opinion.

*Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (internal citations, quotation marks, and

alterations omitted). "The failure to provide good reasons for not crediting the opinion of a

claimant's treating physician is a ground for remand." *Id.*

## 1. Dr. DeFusco's 2016 Opinion

The ALJ assigned "little weight" (R. 17) to the 2016 opinion of Dr. DeFusco (R. 1002-

03). The ALJ gave several reasons, none of which constitute "good reasons" for assigning "little

weight" to the opinion in its entirety. *See Randall v. Berryhill*, 2018 WL 4204438, at *7 (D.

Conn. Sept. 4, 2018) (finding that the "cursory reasoning" provided by the ALJ contained

"apparent deficiencies" and did not constitute "good reasons," necessitating remand). First, the

ALJ noted that the letter did not set forth any functional limitations. (R. 17.) While it is true that

Dr. DeFusco did not provide a detailed assessment of Ms. Aurilio's functional capacity, she did

opine that Ms. Aurilio's functional status "deteriorated to the point where she felt her health was

in total disorder, mental and physical." (R. 1002.) But in any case, the absence of a detailed

functional assessment is not a "good reason" to dismiss the portions of Dr. DeFusco's letter that

do not address specific functional limitations, such as her opinion that undiagnosed Lyme

Disease had been causing Ms. Aurilio's serious health problems during the relevant time period

(R. 1002), an opinion the ALJ's findings contradict (R. 16). *See Stango v. Colvin*, 2016 WL

3369612, at *11 (D. Conn. June 17, 2016) ("[T]he Court is aware of no authority that determines

that a treating physician's opinion should be cast aside where it does not include a function-by-function assessment of the claimant's capabilities." (internal quotation marks omitted)).

Second, the ALJ observes, without citation, that "follow up notes show no recurrence of abnormal cardiac rhythm after January 2013." (R. 17.) For one, Ms. Aurilio has pointed to evidence in the record that she *did* continue to experience cardiac symptoms after January 2013. (ECF No. 18-2 at 4; R. 479.) But in any case, Dr. DeFusco's letter makes only a brief reference to Ms. Aurilio's abnormal cardiac rhythm, and is more focused on a constellation of symptoms that Dr. DeFusco attributes—retrospectively—to Lyme Disease.[1] Because the ALJ's observation cites no supporting evidence and is contradicted by the record, and because it misses the thrust of Dr. DeFusco's opinion, this does not constitute a "good reason" for rejecting that opinion.

Third, the ALJ argues that Dr. DeFusco's statement that Ms. Aurilio "cooperated as best as she could with exercise programs, to no avail" (R. 1002) contradicts her treatment notes indicating Ms. Aurilio engaged in "sustained exercise and gym activity" (R. 17). This does not constitute a good reason for rejecting Dr. DeFusco's opinion either. The ALJ does not cite the treatment notes, but he appears to be referring to repeated notations in Dr. DeFusco's notes that Ms. Aurilio's hobbies included "photography, hiking, walking, working out w/weights" and that

---

[1] Dr. DeFusco states: "Lisa was in need of a primary care physician, and at the time was under treatment for her breast cancer, was adjusting to surgical menopause, and was on medication for a variety of symptoms with puzzling adverse reactions when she presented with palpitations. An increase in medication to treat this would aggravate her symptoms and cardiology became involved and diagnosed her with dysrhythmia. She suffered from migrating moderate to severe muscle and joint pains which were considered due to her aromatase inhibitor for breast cancer, and did not respond to other conservative measures. Lisa had unusual skin rashes, resistant insomnia, and due to all of the above, increasing symptoms of anxiety and depression. In response to this, her medications were adjusted, and Lisa cooperated as best as she could with exercise programs, to no avail. With decline in her overall condition and responses that confounded us, her functional status deteriorated to the point where she felt her health was in total disorder, both physical and mental. . . . Lisa gradually (and wisely) stopped most of her medications, and self-diagnosed a complicated (due to delayed diagnosis) tick-borne infection. Unfortunately, during this time Lisa was coming to me with her symptoms, this was not considered, and delayed her diagnosis, allowing the infection to affect her immune and autonomic systems." (R. 1002-03.)

she "walks dogs 45-90 min 3/week good clip, other days weights." (R. 664.) But these notes were part of Ms. Aurilio's "Social History" and do not appear to have been updated regularly. This notation appears verbatim in nearly all of Dr. DeFusco's notes. (*Compare* R. 838 (from a Jan. 19, 2015 appointment) *with* R. 664 (from a November 11, 2013 appointment) *with* R. 381 (from a September 6, 2011 appointment)). Moreover, the notations sometimes contradict contemporaneous reports by Ms. Aurilio's other physicians. For example, on January 9, 2015, Dr. Dempsey made a note that Ms. Aurilio has been "unable to exercise" "for years." (R. 858.) Just ten days later, on January 19, 2015, Dr. DeFusco again included the same notation indicating that Ms. Aurilio walked her dog three times a week and exercised with weights the other days. In light of Dr. DeFusco's specific opinion on this issue, the ALJ should have at least considered the possibility that these notes were copied and pasted from record to record over the course of the many years Ms. Aurilio saw Dr. DeFusco, along with her medical, surgical, and family histories. They hardly constitute reliable evidence as to Ms. Aurilio's activity level during the relevant time period. Moreover, to the extent that "an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

Furthermore, the ALJ takes Dr. DeFusco's statement out of context. Dr. DeFusco writes that in response to her constellation of symptoms, "[Ms. Aurilio's] medications were adjusted, and [she] cooperated as best as she could with exercise programs, to no avail." (R. 1002.) Dr. DeFusco next notes a "decline in her overall condition" and that her "functional status deteriorated." (R. 1002.) "[T]o no avail" here appears to indicate that efforts to address Ms. Aurilio's health problems, with changes in her medications and with exercise programs, were

unsuccessful, and her condition continued to deteriorate; not that she was unable to exercise at all. A fair reading of the opinion and the relevant portions of the record undermines any claimed contradiction.

Finally, the ALJ argues that Dr. DeFusco's statement that Ms. Aurilio had "increasing symptoms of anxiety and depression" (R. 1002) "stands in contrast to her treatment notes showing improved mood and reactivity" (R. 17). In a November 11, 2013 appointment, Dr. DeFusco notes that Ms. Aurilio's diet change "helped mood and reactivity." (R. 396.) But this note does not indicate how much the diet change helped her mood, nor does it speak to the overall trend during this time period. Indeed, the same note states that she "even had suicidal thoughts which resolved esp[ecially] since" a diet change. (*Id.*) Given the uncontroverted opinion of Dr. Dempsey regarding Ms. Aurilio's "waxing and waning" symptoms due to the nature of her condition (R. 885), periodic reports of feeling better do not undermine Ms. Aurilio's claims.

The ALJ also did not "explicitly consider" the "frequency, length, nature, and extent" of the treating relationship between Ms. Aurilio and Dr. DeFusco, as the treating physician rule required. *Greek v. Colvin*, 802 F.3d at 375. Dr. DeFusco treated Ms. Aurilio on a regular basis throughout the entirety of the relevant time period. In 2013 alone, Dr. DeFusco saw Ms. Aurilio at least five times.[2] Dr. DeFusco is thus uniquely situated to opine on the general trajectory of Ms. Aurilio's condition. The ALJ gives no indication he considered this important factor.

In sum, to the limited extent that Dr. DeFusco's opinion contradicts evidence in the record, the contradictions are ambiguous at best. Further, they are unrelated to an important conclusion drawn by Dr. DeFusco, which the ALJ explicitly rejects. Namely, Dr. DeFusco

---

[2] The record includes notes from appointments on January 2 (R. 465), February 13 (R. 481), April 26 (R. 538), May 10 (R. 543), November 11 (R. 663).

opined that the delay in Ms. Aurilio's diagnosis for Lyme Disease "allow[ed] the infection to affect her immune and autonomic systems." (R. 1002.) Thus, Dr. DeFusco, who had treated Ms. Aurilio through nearly all of the relevant time period, endorsed the theory that many of Ms. Aurilio's symptoms were caused or exacerbated by her then undiagnosed Lyme Disease, which contributed to her "functional status deteriorat[ing] to the point where she felt her health was in total disorder, both physical and mental." (R. 1002.) By contrast, the ALJ concluded that Ms. Aurilio's Lyme Disease did not cause functional limitations prior to the last date insured. (R. 16.) The ALJ has failed to provide a "good reason" for assigning "little weight" to Dr. DeFusco's opinion as to Ms. Aurilio's Lyme Disease and its impact on her during the relevant period. For the above reasons, I find that the ALJ violated the treating physician rule with respect to Dr. DeFusco's 2016 opinion.

## 2. Dr. DeFusco's 2017 Opinion

The ALJ likewise assigned "little weight" (R. 17) to Dr. DeFusco's 2017 Auto Immune Disorder Medical Assessment Form (R. 1130-34). The ALJ explains that the form identifies symptoms that were not noted in Dr. DeFusco's treatment notes from the relevant time period, such as headaches, sore throat, and reduced concentration; that Dr. DeFusco did not provide treatment related to reduced concentration or off-task time; that the findings of physical limitations do not relate back to the last date insured, *i.e.*, December 31, 2013; and that the findings are inconsistent with Dr. DeFusco's notations for normal strength and range of motion. (R. 17.)

The ALJ notes that "the findings for physical limitations do not relate back to the claimant's date last insured or before." (R. 17.) The ALJ does not elaborate on how he came to this conclusion, but it appears to be based on the fact that the assessment indicates that treatment

for Ms. Aurilio's auto immune condition began in August of 2014 (R. 1130).[3]  But to conclude

from this that the assessment does not relate back to the relevant time period ignores several

important facts.  For one, Dr. DeFusco also opined that Ms. Aurilio's undiagnosed Lyme Disease

was causing many of her symptoms during the relevant period, *i.e.*, before December 31, 2013,

and prior to her Lyme Disease diagnosis.  (R. 1002-03.)  Second, Dr. DeFusco treated Ms.

Aurilio throughout most of the relevant time period, *i.e.*, from October 1, 2009 to December 31,

2013.[4]  Third, directly adjacent to the August 2014 treatment date, Dr. DeFusco indicates that the

relevant treatment was provided by Drs. Dempsey and Katz (R. 1130), and other portions of the

record indicate that Ms. Aurilio began treatment with Dr. Dempsey in July of 2014 (R. 786).  In

light of this evidence, the more likely interpretation of the notation that treatment began in

August of 2014 is that this is the date that Ms. Aurilio's post-diagnosis treatment for Lyme

Disease by Drs. Dempsey and Katz began—not that Dr. DeFusco's functional assessment was

limited to this time period.  In short, the ALJ's observation that Dr. DeFusco's findings do not

relate to the relevant time period is not supported by substantial evidence and is not a "good

reason" for rejecting her opinion.[5]

The ALJ provides ostensibly "good reasons" for rejecting some of Dr. DeFusco's

conclusions.  But the ALJ cannot simply dismiss the only detailed functional assessment by a

treating physician in the record simply because some of the symptoms noted on the form, such as

headaches and sore throats, are not found in Dr. DeFusco's contemporaneous treatment notes.

"[A] circumstantial critique by non-physicians, however thorough or responsible, must be

---

[3] This is the position the Commissioner now takes.  (ECF No. 19-1 at 9 ("[T]he doctor stated that she began treating Plaintiff's disorder in August 2014 (at least seven months after the DLI) and did not assess any functional limitations prior to Plaintiff's DLI.").)

[4] Dr. DeFusco treated Ms. Aurilio from February 2010 through at least February 4, 2016. (R. 1002.)

[5] To the extent that the opinion was ambiguous as to the time period to which it relates, the ALJ had a duty to further develop the record.  *See* Section II.B.

overwhelmingly compelling in order to overcome a medical opinion." *Burgess*, 537 F.3d at 129 (quoting *Shaw v. Chater*, 221 F.3d 126, 135 (2d Cir. 2000)). Here, the critique is far from "overwhelmingly compelling."

Moreover, many of Dr. DeFusco's opinions are left entirely unaddressed. Importantly, Dr. DeFusco opined that Ms. Aurilio's impairment would result in an absenteeism rate of "more than four days a month." (R. 1133.) By contrast, the ALJ evidently concluded, without explanation, that Ms. Aurilio's impairment would not cause significant absenteeism, as discussed in greater detail below. I do not mean to imply that the ALJ must provide a specific "good reason" for rejecting each and every symptom and limitation in a treating physician's functional assessment. But absenteeism goes to the heart of Ms. Aurilio's alleged functional limitations. Ms. Aurilio testified that she has good days and bad days, and that on her bad days, debilitating pain as well as severe cognitive and emotional symptoms prevent her from so much as leaving the house. (R. 60-62.) Dr. Dempsey opined that such "waxing and waning" of symptoms was consistent with Ms. Aurilio's condition, and that this feature of her condition "would make it impossible for [her] to commit to any schedule that would require consistency on her part." (R. 885.) What is more, the question of absenteeism is potentially dispositive, as the vocational expert testified that an absenteeism rate of 3 days per month or more would eliminate all work. (R. 69-70.) I find that the ALJ failed to provide "good reasons" for rejecting Dr. DeFusco's opinion as to absenteeism.

And again, the ALJ gives no indication that he has considered the extent and length of Dr. DeFusco's treatment of Ms. Aurilio, which was extensive, as he was required to under the treating physician rule. *See Greek v. Colvin*, 802 F.3d at 375. Dr. DeFusco witnessed the trajectory of Ms. Aurilio's health problems first hand over the course of many years. She is thus

uniquely positioned to opine on Ms. Aurilio's functional limitations during the relevant time period, and the ALJ erred in failing to explicitly consider this factor. *Burgess*, 537 F.3d at 129 ("We note that generally, the longer a treating source has treated the claimant and the more times the claimant has been seen by a treating source, the more weight the Commissioner will give the source's medical opinion." (internal quotation marks and alterations omitted)). For all of the above reasons, I find that the ALJ violated the treating physician rule in ascribing "little weight" to Dr. DeFusco's 2017 opinion.

### 3. Dr. Dempsey's Opinion

The ALJ assigned "little weight" (R. 17) to Dr. Dempsey's opinion (R. 884-85). The ALJ explained that the opinion did not identify the author, "making it difficult for the [ALJ] to evaluate the treatment relationship"; that Ms. Aurilio did not begin treating with the provider until July 2014, seven months after the last date insured; that the time period of the Lyme diagnosis "does not enjoy medical certainty"; and that "the report of feeling well, followed by descent into debilitating symptoms, does not agree with the claimant's scope of activities prior to the date last insured." (R. 17.)

The content of the letter suggests that it was written by a physician who had been treating Ms. Aurilio for over a year. (*See* R. 884-85 (letter dated August 4, 2015 stating that "Lisa A. Aurilio has been under my care since July 2014," that "Lisa presented to be me with a substantial list of symptoms that had been plaguing her for over ten years," that after seeking "help from multiple physicians, to no avail," Ms. Aurilio "found her way to my practice," that the author had taken a detailed medical history and arranged for laboratory tests, that the results of the tests confirmed infection with Lyme Disease, and that her constellation of medical conditions was consistent with Lyme Disease).) In addition, the fact that the author was not identified in the

opinion could have been easily remedied by contacting the provider, Armonk Integrative Medicine, whose address and phone number were included.  (R. 884.)  It is well established that an ALJ has an affirmative duty to fill gaps in the record.  *See, e.g.*, *Hooker v. Colvin*, 2014 WL 1976958, at *7 (W.D.N.Y. May 14, 2014) (holding that "the ALJ is under an affirmative obligation to address evidentiary gaps in the administrative record by recontacting treating sources in order to obtain more detailed information regarding the existence, nature, and severity of the claimed disability" (citations omitted)).  The identity of the author could also have been established with reasonable certainty by simply referencing the many medical records provided by Armonk, which all indicate Dr. Tania Dempsey as the treating physician.  (*See, e.g.*, R. 858.)  Moreover, the Commissioner now acknowledges, on the same record that was before the ALJ, that Dr. Dempsey was in fact the opinion's author.  (*See, e.g.*, ECF No. 19-1 at 5 (repeatedly characterizing the opinion as Dr. Dempsey's).)  The omission of Dr. Dempsey's name from the opinion letter thus hardly constitutes a "good reason" to assign "little weight" to the opinion.  Moreover, the nature and extent of the treatment relationship and whether the physician was a specialist are both factors an ALJ must explicitly consider in determining how much weight an opinion should receive.  *Greek*, 802 F.3d at 375.  To the extent the content of the opinion itself did not allow the ALJ to do that, he had a duty to develop the record.

The ALJ also notes that Dr. Dempsey did not begin treating Ms. Aurilio until July 2014, seven months after the last date insured.  But this is not fatal to Dr. Dempsey's opinion.  "It is well-settled that the 'treating physician rule' applies to retrospective diagnoses, those relating to some prior time period during which the diagnosing physician may or may not have been a treating source, as well as to contemporaneous ones."  *Martinez v. Massanari*, 242 F. Supp. 2d 372, 377 (S.D.N.Y. 2003) (citing cases).  "The retrospective opinion of a doctor who is currently

treating a claimant is 'entitled to significant weight' even though the doctor did not treat the claimant during the relevant period." *Id.* (quoting *Campbell v. Barnhart*, 178 F. Supp. 2d 123, 134-35 (D. Conn. 2001)). Dr. Dempsey diagnosed Ms. Aurilio with Lyme Disease in 2014 based on lab test results, a physical exam, and Ms. Aurilio's reported symptoms, and opined that many of the symptoms Ms. Aurilio had been experiencing since her chemotherapy in 2009 were consistent with untreated Lyme Disease. (R. 884.) Her expert opinion could not be given "little weight" simply because she did not treat Ms. Aurilio prior to the last date insured.

The ALJ further points to Dr. Dempsey's statement that she "cannot say with medical certainty when [Ms. Aurilio] contracted the Lyme Disease." But Dr. Dempsey goes on to say that "[t]he progression of her symptoms in the ensuing years would be consistent with active infections going untreated"; that "the waxing and waning nature of [her] symptoms for the last several years would also be consistent with [her] conditions and illnesses, especially the Lyme disease and autoimmunity"; and that "it is well established that patients suffering from these conditions tend to experience cyclical 'flare-ups', having periods of feeling 'well' or 'normal', only to be followed by a descent into the debilitating symptoms once again." (R. 884-85.) It thus seems clear that Dr. Dempsey's opinion generally *supports* the theory that Ms. Aurilio's many symptoms were caused by her untreated Lyme Disease, including prior to the last date insured. In context, Dr. Dempsey's disclaimer that she cannot say precisely when Ms. Aurilio contracted Lyme Disease is thus not a "good reason" for assigning "little weight" to her opinion.

Finally, the ALJ's argument that "feeling well, followed by descent into debilitating symptoms does not agree with the claimant's scope of activities" (R. 17) also does not constitute a "good reason" for assigning "little weight" to Dr. Dempsey's opinion. The ALJ seems to be referring to Ms. Aurilio's reports that she was exercising. But vague reports about exercising,

many of which do not appear reliable,[6] are simply not inconsistent with fluctuating levels of well-being.

The ALJ nonetheless rejected Dr. Dempsey's opinion, assigning it "little weight," and generally discounted the notion that her later diagnosis of Lyme Disease caused significant functional limitations for her before the date last insured.[7] The extent to which the 2014 diagnosis for Lyme Disease supports Ms. Aurilio's reported symptoms prior to the date last insured is simply not a determination that an ALJ is qualified to make without the benefit of competent expert opinion. *See Rosa v. Callahan*, 168 F.3d at 79 ("The ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." (*quoting McBrayer v. Sec'y of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983))). For all of the above reasons, I find that the ALJ violated the treating physician rule with respect to Dr. Dempsey's opinion.

## B.  Failure To Develop the Record

Ms. Aurilio also argues that the ALJ failed to fulfill his duty to develop the record. (*Id.* at 9-11.) I agree.

"[A] large body of case law hold[s] that an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Staggers v. Colvin*, 2015 WL 4751123, at *2 (D. Conn. Aug. 11, 2015) (internal quotation marks and citations omitted). Where there is such an absence of supporting medical opinion, the ALJ has an "affirmative duty to request RFC assessments from a plaintiff's treating sources." *Felder v. Astrue*, 2012 WL 3993594, at *11

---

[6] *See* Section II.A.1.
[7] Although the ALJ's decision states at one point that the "evidence *does* establish a retroactive diagnosis for Lyme disease" (R. 16 (emphasis added)), the context suggests that this was a typographical error and that the ALJ actually concluded that the evidence does *not* establish a retroactive diagnosis. For example, the very next sentence states, "Her report for regular exercise and feeling better *also* militate against the theory that her Lyme Disease caused functional limits prior to the date last insured." (R. 16 (emphasis added).) In fact, the entire paragraph is dedicated to arguments against finding a retrospective diagnosis.

(E.D.N.Y. Sept. 11, 2012); *see also Marshall v. Colvin*, 2013 WL 5878112, at *9 (W.D.N.Y. Oct. 30, 2013) (finding that a record with "extensive medical documentation" was insufficient because "it lacked any statement from Plaintiff's treating physicians . . . regarding her functional abilities"); *Aceto v. Commr. of Soc. Sec.*, 2012 WL 5876640, at *16 (N.D.N.Y. Nov. 20, 2012) ("Since the ALJ had nothing more than treatment records and consultative reports to review, he had an affirmative duty to develop the record and request that Plaintiff's treating physicians assess her RFC.").  Courts have applied this doctrine not only when an ALJ has no medical opinions from treating physicians whatsoever, but also when the ALJ assigned little or no weight to all of the medical opinions that were available.  *See, e.g.*, *Trombley v. Berryhill*, 2019 WL 1198354, at *4 (W.D.N.Y. Mar. 14, 2019); *Kurlan v. Berryhill*, 2019 WL 978817 at *3 (D. Conn. Feb. 28, 2019) ("Because he gave little to no weight to all of the medical opinions, however, the ALJ had a duty to develop the record and obtain relevant medical opinions before making the RFC assessment.").

However, remand is not required if "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Commr. of Soc. Sec.*, 521 Fed. Appx. 29, 34 (2d Cir. 2013). In *Tankisi*, remand was not warranted because "the ALJ had a number of functional assessments from consultative examiners and some form of functional assessment from a treating source" even though there were no formal RFC assessments. *Staggers*, 2015 WL 4751123, at *3.  So while "it is not *per se* error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician, a decision not to remand assumes that there are no obvious gaps in the record precluding the ALJ from properly assessing the claimant's residual functional capacity." *Downes v. Colvin*, 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015) (internal quotation marks and

citations omitted). Accordingly, "courts have upheld an ALJ's RFC finding only where the record is clear and, typically, where there is *some* useful assessment of the claimant's limitations from a medical source." *Staggers*, 2015 WL 4751123, at *3; *see also Kurlan*, 2019 WL 978817 at *3-4 (remanding for further development of the record only after concluding that the ALJ's RFC formulation was not otherwise supported by substantial evidence).

Here, the ALJ determined that Ms. Aurilio "had the residual functional capacity to perform light work[8] as defined in 20 CFR 404.1567(b) except she can never climb ladders/ropes/scaffolds. She can frequently climb stairs/ramps, balance, stoop, crouch, crawl/kneel. She can frequently handle/finger. She cannot work in exposure to temperature extremes (particularly cold). She must avoid concentrated exposure to pulmonary irritants. She can perform simple, routine, repetitive tasks. She can sustain concentration, persistence, and pace for 2-hour segments. She has no problem interacting with others." (R. 14.)

There are, however, no functional assessments from any of Ms. Aurilio's numerous treating physicians to support the ALJ's RFC assessment. The opinions of Dr. Sorcernelli (R. 311, 804) and Dr. Kline (R. 881-82) do not contain functional assessments at all, and the ALJ in any event gave them "little weight" (R. 17). As previously discussed, the ALJ also gave "little weight" to the opinions of Dr. Dempsey and Dr. DeFusco (R. 17), including Dr. DeFusco's 2017 opinion (R. 1130-34), which contained the only detailed functional assessment by a treating physician. The ALJ also assigned "little weight" to the opinions of the state agency examiners, who neither treated nor even examined Ms. Aurilio. (R. 17.) Thus, there were no functional

---

[8] According to the regulations, light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

assessments by a treating physician to which the ALJ assigned even "partial weight." "In rejecting all of the medical opinions in the record, the ALJ created an evidentiary gap in the record with regard to Plaintiff's functional limitations and RFC." *Jessica B. v. Comm'r of Soc. Sec.*, 2019 WL 3494356 at *4 (N.D.N.Y. Aug. 1, 2019).

It does not automatically follow, however, that remand for further development of the record is necessary. A court may still uphold an ALJ's finding where "there are no obvious gaps in the record precluding the ALJ from properly assessing the claimant's residual functional capacity." *Downes v. Colvin*, 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015). Remand is unnecessary, in other words, where "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi*, 521 Fed. Appx. at 34.

Here, the evidence is insufficient to support the ALJ's assessment of Ms. Aurilio's RFC in at least one significant respect. The ALJ apparently concluded that Ms. Aurilio would not need to be absent from work on a regular basis. As noted above, this conclusion goes to the heart of Ms. Aurilio's alleged impairment. Dr. DeFusco's 2017 opinion indicated that Ms. Aurilio would need to be absent from work more than four times per month. (R. 1133.) Similarly, Dr. Dempsey opined that "[i]t is well established that patients suffering from these conditions tend to experience cyclical 'flare-ups', having periods of feeling 'well' or 'normal', only to be followed by a descent into the debilitating symptoms once again." (R. 885.) She also opined that Ms. Aurilio's condition "would make it impossible for [her] to commit to any schedule that would require consistency on her part." (*Id.*) Ms. Aurilio herself testified that she had as many as 20-25 "bad days" per month during the relevant period, rendering her unable to so much as leave the house (R. 56, 61), and much of her testimony as to her capabilities pertained only to her "good days" (*see, e.g.*¸ R. 52 (testifying that she could walk 3 miles on a

"good day")).  Notwithstanding this evidence, and without explanation, the ALJ evidently concluded that an RFC with a significant level of absenteeism was not justified.[9]

The ALJ's conclusion as to absenteeism is not supported by substantial evidence in the record.  The ALJ's decision places much weight on Ms. Aurilio's occasional reports to her physicians that she was exercising and feeling better.  For example, the ALJ wrote that the theory that Lyme caused her functional limitations was belied by the fact that, at the time of her diagnosis with Lyme Disease, Ms. Aurilio "reported improved energy and regular exercise," and that she was "feeling a lot better."  (R. 16.)  The treatment notes the ALJ cites come from an October 2014 follow-up appointment with Dr. Chung, Ms. Aurilio's oncologist.  The notes indicate "[e]nergy improved and exercising fairly regularly."  (R. 708.)  The notes further indicate that, "Overall she is feeling better compared to last year when she had a lot of problems with depression, food sensitivity, cognitive impairment, joint pain and swelling."  (*Id.*)  For one, these notes do not give any indication of the severity of Ms. Aurilio's symptoms around the time of the appointment, only that they were "better" than in the previous year (2013).  For a person battling multiple illnesses who had not worked for five years, "better" does not necessarily mean "healthy enough to work a consistent schedule."  Moreover, Dr. Chung was Ms. Aurilio's oncologist responsible for monitoring her breast cancer, not her primary care doctor responsible for her general health nor the doctor responsible for treating her Lyme Disease.  Furthermore, occasional reports of feeling better are unremarkable according to Dr. Dempsey's opinion regarding the "waxing and waning" nature of Ms. Aurilio's conditions, which, as explained above, the ALJ improperly rejected.  (R. 884.)

---

[9] The ALJ's decision does not include any explicit findings as to absenteeism.  But one of the hypotheticals the ALJ posed to the vocational expert included an absenteeism rate of 3-4 days per month.  (R. 69.)  The vocational expert testified that no work would be available with such a limitation.  (Id.)  In light of this testimony, it is clear that the ALJ found that an RFC with this level of absenteeism was not justified.

The ALJ also relied on Dr. DeFusco's notes indicating Ms. Aurilio exercised and walked her dog regularly. As previously discussed, these notations appear to have been copied and pasted verbatim from appointment to appointment, along with Ms. Aurilio's family and medical history. *See* Section II.A.1. Their reliability as a real-time indicator of her capabilities is thus questionable. The ALJ also misstates the content of these notes. The notes indicate that Ms. Aurilio "walks dogs 45-90 min 3/week. good clip, other days weights" (R. 664), not that she "had been going to the gym 3 days per week, for 45-90 minutes per visit" (R. 15). This misreading appears to have contributed to the ALJ's conclusion that "the frequency and intensity of her exercise regimen militate against her allegations of fatigue and joint pain." (R. 16.) Moreover, the ALJ does not cite, and the Court was not able to find, any evidence in the record whatsoever regarding the "intensity" of Ms. Aurilio's exercise regimen. Most importantly, this evidence simply does not speak to the issue of absenteeism, as the ability to engage in some form of exercise, periodically and on one's own schedule, is not inconsistent with absenteeism resulting from an impairment.

In short, to the extent that the ALJ provides any explanation for his conclusion as to absenteeism, he largely relies on the fact that, over the course of more than three years, Ms. Aurilio occasionally reported, at one of her medical appointments, that she was exercising and feeling better. This simply does not constitute substantial evidence that Ms. Aurilio would not need to be absent from work four or more times per month due to her impairments. Even if the ALJ had adequately justified his assignment of "little weight" to the opinions of Dr. DeFusco and Dr. Dempsey, the ALJ still cannot make findings not supported by substantial evidence. Rather, in presiding over an essentially "non-adversarial" proceeding, the ALJ had a responsibility to resolve the ambiguities in the evidence by further developing the record. *See*

*Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) ("It is the rule in our circuit that the ALJ, unlike a judge in a trial, must herself affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding. This duty . . . exists even when . . . the claimant is represented by counsel." (internal quotation marks and alterations omitted)).  The ALJ erred by instead substituting his own judgment for competent medical opinion.

The Commissioner now cites additional evidence in support of the ALJ's conclusions. But it is a "fundamental rule of administrative law" that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Should the court find "those grounds [to be] inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Id.*  Thus, to the extent that the Commissioner seeks to supplement the ALJ's decision, his argument is unavailing.  The Commissioner now argues, for example, that the ALJ properly based his RFC determination on the assessments of the state agency examiners, Dr. Bronstein and Dr. Holmes.  (ECF No. 19-1 at 7; R. 78-109.)  But the ALJ explicitly stated that he placed "little weight" on these assessments (R. 17), and there is no indication in his decision that he relied on them.  Further, Drs. Bronstein and Holmes not only never treated Ms. Aurilio, they did not even examine her.  "A corollary to the treating physician rule is that the opinion of a non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis." *Hidalgo v. Bowen*, 822 F.2d 294, 297 (2d Cir. 1987).  In any case, the assessments

do not appear to even address absenteeism, and thus cannot represent substantial evidence for the ALJ's conclusion as to absenteeism.[10]

The Commissioner also argues that residual functional capacity is an "administrative assessment" and "the responsibility for determining a claimant's RFC rests solely with the ALJ." (ECF No. 19-1 at 7.) But "[a]lthough residual functional capacity determinations are reserved for the Commissioner, *see* 20 C.F.R. § 404.1527(e)(2), administrative law judges are unqualified to assess residual functional capacity on the basis of bare medical findings in instances when there is a relatively high degree of impairment." *Palascak v. Colvin*, 2014 WL 1920510, at *8 (W.D.N.Y. May 14, 2014) (citations and internal quotation marks omitted). "Given Plaintiff's multiple physical and mental impairments, this is not a case where the medical evidence shows relatively little physical impairment such that the ALJ can render a common sense judgment about functional capacity." *Id.* at *9 (citations and internal quotation marks omitted).

In sum, the ALJ assigned "little weight" to every medical opinion before him, creating a gap in the record and an obligation to further develop the evidence. The record was not so clear as to obviate the need for further development. Importantly, the ALJ does not point to any substantial evidence to support his finding as to absenteeism. Accordingly, remand is necessary.

## C. Reevaluation on Remand

In addition to addressing the issues identified in this opinion, the ALJ is further directed on remand to reevaluate Ms. Aurilio's testimony as to her pain and the severity of her symptoms in light of his reevaluation of the available opinion evidence as well as any new evidence. *See*

---

[10]  The Commissioner also points to Ms. Aurilio's statement to Dr. Higgins that she was "feeling well without any significant fatigue and is exercising for one hour a day." (ECF No. 19-1 at 8; R. 504.) But this statement was made in March of 2010, just before she began radiation therapy to treat her breast cancer in May of 2010 (ECF No. 18-1 at 3) and well before 2013, when Ms. Aurilio claims her condition took a significant turn for the worse (R. 540 ("Mrs. Aurilio describes especially since January 2013 that her 'life spun out of control' and that . . . major health issues continue to severely affect her everyday functioning.")).  The same can be said of Ms. Aurilio's statements to Dr. Chung in May of 2010 and March of 2011, also cited by the Commissioner.  (ECF No. 19-1 at 8.)

*Demera v. Astrue*, 2013 WL 391006, at *4 (E.D.N.Y. Jan. 24, 2013) ("[A]fter the ALJ reassesses the opinions of the four treating physicians and obtains additional information as needed to resolve any inconsistencies or ambiguities, the ALJ must likewise reassess the credibility of [the claimant's] subjective complaints."). Accordingly, I do not reach Ms. Aurilio's argument that her pain was not properly analyzed.

I do not reach Ms. Aurilio's remaining arguments.

## III. Conclusion

For the reasons set forth above, Ms. Aurilio's motion to reverse (ECF No. 18) is GRANTED and the Commissioner's motion to affirm (ECF No. 19) is DENIED. The case is hereby REMANDED.

IT IS SO ORDERED.

_____/s/_____<br>
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              September 16, 2019